FILED

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

2016 JUL -1 PM 3:50

UNITED STATES OF AMERICA

v.

CASE NO. 8:16-cr-296-T-23JSS

18 U.S.C. § 371
18 U.S.C. § 982(a)(7) (forfeiture)

DANIEL KEITH O'BRIANT,
a/k/a "Keith"

## INFORMATION

The United States Attorney charges:

### COUNT ONE

#### A. Introduction

At all times material to this Information:

**I.   ABH**

1.   "ABH" (a company known to the defendant and the government), was a biopharmaceutical company founded in 2004 that developed and commercialized bioengineered tissue products and regenerative medicine therapies.  ABD was headquartered in Westport, CT, and had a large manufacturing plant and training facility in La Jolla, CA.  Effective July 18, 2012, ABD was acquired by another company, and operated as a wholly-owned subsidiary under the new name "SRM" (known to the defendant and the government).

2.   "DG" was a bioengineered skin substitute approved by the United States Federal Drug Administration for treatment of diabetic foot ulcers. ABH acquired the rights to DF in May 2006, and began selling DG to United States customers in February 2007. In 2011, ABH had DG sales in the United States of approximately $195.6 million.

3.   The defendant, DANIEL KEITH O'BRIANT (also known as Keith), was hired by ABH near the end of 2006 as "Vice President, Sales." The defendant's title was changed in 2009 to "Senior Vice President, North American Sales," and then again in 2012 to "Senior Vice President, Commercial Operations." In 2011 as the Senior Vice President of North American Sales, the defendant directly supervised approximately four National Sales Directors, who oversaw approximately thirteen Regional Sales Directors, who in-turn oversaw more than one hundred additional localized sales representatives throughout the country.

II.   **Medicare**

4.   The Medicare program ("Medicare") was a federal "health care benefit program," as defined by Title 18, United States Code, Section 24(b), that provided medical benefits, items and services (collectively "services") to beneficiaries age 65 and older with certain disabilities.

5.   Medicare included coverage under two primary components, hospital insurance (Part A) and medical insurance (Part B). Medicare Part A was a hospital insurance program that covered beneficiaries for, among other things,

inpatient care in hospitals. Medicare Part B provided supplemental medical insurance to beneficiaries for, among other things, medically-necessary outpatient care and the application of skin grafts.

6. The Centers for Medicare and Medicaid Services ("CMS"), an agency within the United States Department of Health and Human Services, oversaw and administered Medicare throughout the United States. CMS divided the United States in geographic regions and contracted with various companies in those regions to assist in the administration of Medicare. These regional contractors were receiving, processing, and paying Medicare Part A and Medicare Part B claims that were submitted by their respective Medicare providers.

### III. TRICARE

7. TRICARE was a triple option health care benefit plan of the United States Department of Defense Military Health System. Eligible TRICARE beneficiaries included members of all seven branches of the Uniformed Services: Army, Air Force, Navy, Marine Corps, National Oceanic and Atmospheric Administration, Coast Guard, and the commissioned corps of the Public Health Service. TRICARE received federal funds allocated through the annual Department of Defense Appropriations Acts. A private corporation under contract with TRICARE acted as a "fiscal intermediary" and was authorized to receive and process claims on behalf of TRICARE. Health care service

providers were reimbursed with federal funds for benefits and services provided to TRICARE beneficiaries.

### IV.    U.S. Department of Veterans Affairs

8.    The United States Department of Veterans Affairs (VA) was a military veteran benefit system with Cabinet-level status. The VA, through its Veterans Health Administration, operated one of the largest health care systems in the world. The VA health care system included 152 hospitals, 800 community-based outpatient clinics, 126 nursing home care units and 35 domiciliaries. Diabetic foot ulcers were among the diseases treated by the VA.

9.    On December 1, 2008, ABH was awarded a five year Federal Supply Schedule, contract number V797P-4155B, to provide DG to the VA at the cost of $1360.00 per unit. AG (a competing product to DG) had no Federal Supply Schedule or other VA government contract for AG until 2014, but nonetheless AG could still be purchased and used by VA physicians and clinicians if they wished to do so.

10.    Each VA facility placed orders for DG against the Federal Supply Schedule contract based upon a physician and/or clinician's determination that the DG was the appropriate treatment protocol for the patient. VA facilities could purchase DG with very few internal restrictions.

11.    The primary focus of ABH's Federal Markets Division was to market and promote DG at VA facilities around the nation.

V. **Algorithm**

12. A medical algorithm is a system designed to improve and standardize decisions made in the delivery of medical care. An algorithm is a set of criteria designed to indicate when a medicine, treatment, or other medical application should be given. Medical algorithms assist in standard selection and application of treatment regimes. When ABH began to market DG to the VA, the VA had no algorithm related to DG.

### B. The Agreement

13. Beginning in or about January 2008, and continuing until in or around January 2012, in the Middle District of Florida, and elsewhere,

DANIEL KEITH O'BRIANT,
a/k/a Keith,

defendant herein, knowingly and willfully did combine conspire, confederate and agree together with others known and unknown, to offer and pay remuneration directly and indirectly, overtly and covertly, in cash and in kind to physicians and physicians' staff to induce such persons to purchase, order, and arrange for and recommend purchasing and ordering DG for which payment was made in whole or in part under a Federal health care program, including Medicare Part B, TRICARE, and the VA, in violation of 42 U.S.C. § 1320a-7b(b)(2)(B).

### C. Manner and Means

14. The manner and means by which the defendant and others sought to accomplish the objects of the conspiracy included, among others, the following:

(a) It was part of the conspiracy that the conspirators would and did offer and pay physicians and the physicians' staff kickbacks of cash equivalents and other in-kind inducements to order, purchase, and use DG on Medicare, TRICARE, and VA program beneficiaries.

(b) It was further part of the conspiracy that the conspirators would and did engage in multiple meetings, perform acts, and make statements, to promote and achieve the objects of the conspiracy and to hide and conceal the purposes of the conspiracy and the acts committed in furtherance thereof.

### D. Overt Acts

15. In furtherance of the conspiracy and to effect its objects, the following overt acts, among others, were committed by the defendant or other co-conspirators in the Middle District of Florida, and elsewhere:

a. in or about August 2009, following an ABH compliance presentation in the Middle District of Florida that, among other things, emphasized that the need to comply with the anti-kickback laws, the defendant instructed Tony Ezell, Nick Rallo, and others to continue providing inducement and kickbacks to physicians in order to promote or reinforce sales.

b. in or about August 2009, Tony Ezell created a simple Word file which looked like a valid receipt (the Receipt Maker or Magic Wand) that could be easily edited to create bogus receipts that appeared legitimate. This file was shared amongst conspirators in the company.

  c. on or about September 10th through the 12th, 2009, ABH officials held a bachelor party in Las Vegas for one of the top billing physicians in the United States. The defendant attended part of the trip.

  d. on or about September 11, 2009, money was spent to pay for the doctor's bachelor party. A fake receipt was created to mask how $2,576.64 was being spent. This fake receipt was submitted to ABH for payment and approved by the defendant, who knew that the receipt was, in truth and fact, faked to mask how the money was really being spent.

  e. on or about September 12, 2009, $2,820.43 was spent at Tryst Nightclub in Las Vegas as part of the doctor's bachelor party. The description of this expense in ABH's books and records was falsified as a "Standard of Care Presentation at the ABDO Wound Conference." The defendant knew this description was false because he knew, in truth and fact, that the false description masked how the money was really being spent. The defendant approved the receipt.

  f. on or about September 4, 2010, a high-referring VA doctor attended a KISS concert with two guests, said concert tickets costing $628.65 and paid for by ABH. The expense was submitted to the defendant for approval by Todd Clawson. The defendant approved it for payment.

  g. on or about August 11th through the 14th, 2011, a group of high-referring VA doctors were taken to the Snake River Lodge & Spa in Jackson Hole, WY, for a luxury getaway fishing trip. The cost of the lodging and

accommodations was $6,476.28 and ABH paid for the trip. Clawson submitted the $6,476.28 to the defendant for payment in June 2011 and the defendant approved the expense.

      h.    on or about August 26, 2011, a high-referring VA doctor attended a Def Leppard concert with three guests, said concert tickets costing $1,012.55 and paid for by ABH. The expense was submitted to the defendant for approval by Todd Clawson. The defendant approved it for payment.

      i.    during the conspiracy, the defendant knew many of the expenses he was approving were kickbacks.

All in violation of Title 18, United States Code, Section 371.

## FORFEITURES

1.    The allegations contained in Count One of this Information are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to the provision of Title 18, United States Code, Section 982(a)(7).

2.    Upon conviction of the conspiracy to violate Title 42, United States Code, Section 1320a-7b(b)(2)(8), in violation of Title 18, United States Code, Section 371, the defendant shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(7), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offenses.

3. The property to be forfeited includes, but is not limited to, a $475,045.58 forfeiture money judgment.

4. If any of the property described above, as a result of any act or omission of the defendant:

> (a) cannot be located upon the exercise of due diligence;
>
> (b) has been transferred or sold to, or deposited with, a third party;
>
> (c) has been placed beyond the jurisdiction of the court;
>
> (d) has been substantially diminished in value; or
>
> (e) has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property under the provisions of Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1).

A. LEE BENTLEY, III
United States Attorney

By: _____
Jay G. Trezevant
Assistant United States Attorney

By: _____
Thomas N. Palermo
Assistant United States Attorney

By: _____
Robert A. Mosakowski
Assistant United States Attorney
Chief, Economic Crimes Section